787 So.2d 811 (2001)
STATE of Florida, Petitioner,
v.
Charles BRADFORD, Respondent.
No. SC96910.
Supreme Court of Florida.
May 31, 2001.
*814 Robert A. Butterworth, Attorney General, Celia Terenzio, Assistant Attorney General, Bureau Chief, West Palm Beach, FL; and Robert R. Wheeler, Assistant Attorney General, Tallahassee, FL, for Petitioner.
Michael E. Dutko of Bogenschutz & Dutko, P.A., Fort Lauderdale, FL, for Respondent.
Henry M. Coxe, III, and Aaron Metcalf of Bedell, Dittmar, DeVault, Pillans & Coxe, Jacksonville, FL; D. Gray Thomas and Wm. J. Sheppard of Sheppard, White & Thomas, P.A., Jacksonville, FL; and Robert Stuart Willis of Willis & Ferebee, P.A., Jacksonville, FL, for Steven Warfield, Lakewood Chiropractic Clinic, d/b/a Warfield Chiropractic Center, Mark E. Klempner, Casmar, Inc., and Craig J. Oswald, Amici Curiae.
Robert A. Ader and Elizabeth B. Hitt of the Law Offices of Robert Ader, Miami, FL, for Dr. Randolph Hansbrough, Amicus Curiae.
LEWIS, J.
We have for review Bradford v. State, 740 So.2d 569 (Fla. 4th DCA 1999), which expressly declares valid section 817.234(8), Florida Statutes (1997), a statute criminalizing certain conduct related to solicitation when insurance benefits are available. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. For the reasons set forth below, we quash the district court's decision. In so doing, we hold that because the Legislature did not include fraudulent intent as an element of unlawful insurance solicitation, the statute at issue unconstitutionally infringes upon the protections afforded commercial speech by the First Amendment to the United States Constitution.[1]

FACTS
This case is one in a long line of cases in which the State charged several chiropractors with unlawful insurance solicitation in violation of section 817.234(8).[2] The specific facts relating to Mr. Bradford's prosecution are as follows.
Charles Bradford, a licensed chiropractor, was charged by information with two counts of unlawful insurance solicitation in violation of section 817.234(8). The charges stemmed from Bradford's business relationship with Prebeck Consultants, Incorporated, a company engaged in the business of scheduling appointments with chiropractors for persons involved in motor vehicle accidents. Specifically, in this case, after obtaining a motor vehicle accident report, a Prebeck representative telephonically solicited persons listed on an accident report for the purpose of scheduling an initial examination with Bradford, and possible subsequent treatment, if necessary, for injuries arising from the traffic accident. Bradford examined the solicited individuals, determined that treatment was necessary, and later billed their personal injury protection (PIP) insurance carrier for the services rendered. During the course of pretrial hearings, the State acknowledged and agreed that Bradford's conduct contained no element of fraudulent behavior, but explained that the statute under which he was being prosecuted did not require proof of any element of fraud. Ultimately, after the trial court denied Bradford's motion to dismiss, he entered a *815 plea of no contest to the lesser included offense of conspiracy to commit unlawful insurance solicitation, specifically reserving his right to seek appellate review of the issue concerning the alleged unconstitutionality of the statute under which he had been charged.
While Bradford was seeking review of his conviction, other chiropractors also charged with unlawful insurance solicitation were also appealing their convictions. The first of these cases to have an appellate decision was Barr v. State, 731 So.2d 126 (Fla. 4th DCA 1999). The chiropractors in Barr challenged the constitutionality of subsection (8) of the subject statute on several bases. Relevant to our consideration was the challenge presented under First Amendment protection. The district court, applying the test outlined by the United States Supreme Court in Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), held:
[T]he first prong of the Central Hudson test is satisfied, as the solicitation made by Edelson and Barr was unlawful only because it violated section 817.234(8), and not for any other reason. In addition, the record reflects that the state satisfied the second prong by proving that substantial state interests were involved. Specifically, in response to the motions to dismiss, the state filed a 1975 Dade County Grand Jury Report, which clarified that the statute was created in part to combat both insurance fraud and a resulting increase in insurance premiums borne ultimately by the public. This report also satisfied the third prong of the test by showing that subsection (8) directly advances the state's interest in preventing insurance fraud. As the report suggests, there was a serious problem in the industry of "runners" soliciting automobile accident victims with little or no injuries to undergo unnecessary medical treatment so that they could exhaust the victims' PIP benefits before the victims sued in tort for damages. From an objective standpoint, we believe the statute's prohibition against this type of solicitation provides a direct link to the state's interest in preventing harm to such victims and the insurance industry.
Finally, we hold the state satisfied the fourth prong of the test by demonstrating that subsection (8) is narrowly drawn. The statute is not a blanket ban on all solicitation of business by a chiropractor, but rather, targets only those persons who solicit business for the sole purpose of making motor vehicle tort or PIP benefits claims. Although not the least restrictive means available to achieve the state's purpose, we hold the ban on such solicitation is reasonably tailored to the state's interest in preventing insurance fraud and raised premiums.
Edelson and Barr's reliance on Edenfield v. Fane, 507 U.S. 761, 764, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) and Innovative Database Systems v. Morales, 990 F.2d 217, 222 (5th Cir.1993), as support for their argument that the statute is not narrowly tailored, is misplaced. The statutes in those cases placed total bans on the professional solicitation at issue which were not sufficiently tailored in scope or purpose. In contrast, section 817.234(8), by limiting its purpose to the filing of motor vehicle tort or PIP benefits claims, is reasonably tailored to fit the state's interests in preventing insurance fraud and rising premiums.
Barr, 731 So.2d at 129.
Shortly after the Barr decision was published, Bradford's case was also presented to the Fourth District. See Bradford, 740 *816 So.2d at 569. Based on its analysis in Barr, the Fourth District again determined that the statute was constitutional. See Bradford, 740 So.2d at 570. The district court, noting that it was only writing to clarify why subsection (8) did not punish purely innocent activity, concluded that "in enacting subsection (8) [the Legislature] intended to punish only solicitations made for the sole purpose of defrauding that patient's PIP insurer." Id. at 571. This reasoning was based on (1) the district court's decision to read subsection (1)(a), which criminalizes certain acts performed with the intent to defraud, in pari materia with subsection (8), which was totally void of any language as to intent to defraud; and (2) the Fourth District's focus on the title of section 817.234: "False and fraudulent insurance claims." Thus, the Fourth District's reasoning essentially inserted an element into the statute that did not otherwise exist.
In late 1999, the Third District was presented with yet another of these cases challenging the validity of section 817.234(8) on, inter alia, First Amendment grounds. See Hershkowitz v. State, 744 So.2d 1268 (Fla. 3d DCA 1999). The district court in Hershkowitz relied on the Fourth District's decisions in Barr and Bradford to conclude that the statute did not create a constitutionally impermissible burden on the right to commercial speech. See Hershkowitz, 744 So.2d at 1270.
Approximately one year after announcing the Bradford decision, the Fourth District again addressed the constitutionality of section 817.234(8). See Hansbrough v. State, 757 So.2d at 1282 (Fla. 4th DCA), review granted, 779 So.2d 271 (Fla.2000). In that case, however, the court wrote:
[T]his court, in Bradford [], followed Barr, but, in order to satisfy the third-prong of the Central Hudson four-prong test, interpreted section 817.234(8) as applying only where the defendant intends to defraud an insurance carrier. However, in Barr, we had previously ruled that section 817.234(8) satisfied the state's interest in preventing fraud. Accordingly, language in Bradford, interpreting section 817.234(8) as requiring an intent to defraud in order to satisfy the third prong of the Central Hudson test, was dicta and not controlling.[[3]]
Id. at 1283.
During the pendency of the present case, the First District departed from the reasoning espoused by the Third and Fourth Districts and held that the statute is unconstitutional. See State v. Cronin, 774 So.2d 871 (Fla. 1st DCA 2000). In Cronin, the district court first determined that there was no support for the conclusion that the Legislature intended to make fraudulent intent an element of the statute at issue. See id. at 874. The court further held that the statute was unconstitutional because it was not narrowly tailored, *817 as required by the Central Hudson test. See id. at 876.
With that background in mind, we consider two issues. First, we must determine whether intent to defraud is an element of the offense of unlawful insurance solicitation, as specifically codified in section 817.234(8). Second, if fraud is not an element, we must then decide whether section 817.234(8) violates the protections afforded by the First Amendment to commercial speech. We address each issue in turn.

1. Whether Intent to Defraud Is an Element of Section 817.234(8), Florida Statutes (1997).

A. Plain Meaning
This Court has repeatedly held that "the plain meaning of statutory language is the first consideration of statutory construction." Capers v. State, 678 So.2d 330, 332 (Fla.1996). Section 817.234(8) states in pertinent part:
It is unlawful for any person ... to solicit any business ... for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits required by s. 627.736. Any person who violates the provisions of this subsection commits a felony of the third degree....
Obviously, there is no mention of fraud as an element of the offense. In fact, as noted by Judge Stone in Hansbrough:
The statute in question, distilled to its most essential terms, provides that it is unlawful for any "person ... to solicit any business ... for the purpose of making ... claims for personal injury protection benefits...." § 817.234(8), Fla.Stat. Subsection (8) does not include the words "with the intent to defraud." As it is not ambiguous, we should assume the omission was intentional. See Holly v. Auld, 450 So.2d 217, 219 (Fla. 1984).
757 So.2d at 1283 (Stone, J., concurring specially). The same reasoning was echoed by the First District Court of Appeal in its recent decision in Cronin where the court noted that "section 817.234(8) clearly and unambiguously does not include the requirement that the solicitation occur with the intent to defraud." See 774 So.2d at 874. In our view, the plain language of the statute clearly and unambiguously indicates that intent to defraud is simply not an element of the offense as established by the Legislature.
To this end, we have held that "[w]here the language of the statute is plain and unambiguous, there is no need for judicial interpretation." T.R. v. State, 677 So.2d 270, 271 (Fla.1996); see also State v. Mark Marks, P.A., 698 So.2d 533, 540 (Fla.1997); Pardo v. State, 596 So.2d 665, 667 (Fla.1992). Because we conclude that the language of this statute is facially clear and unambiguous, our analysis need not proceed any further. However, our conclusion here that intent to defraud is not an element of the offense is similarly fully substantiated by this statute's legislative history and by canons of statutory construction.

B. Legislative History
In an apparent response to concerns that unscrupulous doctors and lawyers were inflating or outright falsifying personal injury claims in an effort to meet and exceed the statutory monetary threshold amount,[4] the Legislature enacted section *818 627.7375, Florida Statutes (Supp.1976). See ch. 76-266, § 7, Laws of Fla.[5] Section 627.7375, when enacted, contained essentially that which is now found in subsections (1) through (4) of section 817.234, all of which then included, and still include, fraud as an element of the crime. The following year, through the adoption of chapter 77-468, section 36, Laws of Florida, subsections (8) and (9)[6] were added.[7] Neither subsection (8) nor (9) contained any language pertaining to fraudulent intent. Moreover, the staff analysis for section 36, as it specifically related to subsection (8), simply indicated that the statute was amended to "[p]rovide[] that acting as a runner is a third degree felony." Fla.S. Comm. on Com., CS for SB 1181 (1977) Staff Analysis (June 7, 1977)(on file at Florida Archives). The staff analysis, albeit brief, clearly supports the conclusion that intent to defraud has never been an element of subsection (8). Instead, it is evident to us that subsection (8) solely seeks to curtail what has come to be known as chasing business, irrespective of any intent to defraud.
In 1978, subsections (8) and (9), both of which, at the time of enactment, prohibited solicitation for the purpose of making motor vehicle tort claims, were amended to prohibit solicitation for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits. See ch. 78-258, § 3, Laws of Fla. The Legislature, again having the opportunity to include intent to defraud as an element, did not do so.
The following year, the entire section (then-section 627.7375) was renumbered as section 817.234. See ch. 79-81, § 1, Laws of Fla. Worthy of notice, however, is that during the same year, the Legislature passed a reviser's bill to remove inconsistencies and redundancies and otherwise clarify statutes and facilitate their correct interpretation. See ch. 79-400, Laws of Fla. While revising then-section 627.7375, the Legislature permitted subsections (8) and (9) to remain untouched. See ch. 79-400, § 240, Laws of Fla. Subsections (8) and (9) have remained, essentially, unchanged since 1979. In our view, it is clear from the preceding analysis that the legislative history accompanying section 817.234(8) also supports the conclusion that the Legislature, having had ample opportunity to do so, did not include fraudulent intent as an element of the offense of unlawful insurance solicitation.

C. Statutory Construction
Respondent Bradford initially asserts that section 817.234 is codified within a chapter entitled "Fraudulent Practices" and is itself entitled "False and Fraudulent Insurance Claims." Thus, Bradford presents the position that the title of section *819 817.234 evinces a strong indication that the Legislature intended fraud to be an element of subsection (8). In this respect, we have held:
The arrangement and classification of laws for purposes of codification in the Florida Statutes is an administrative function of the Joint Legislative Management Committee of the Florida Legislature. The classification of a law or a part of a law in a particular title or chapter of Florida Statutes is not determinative on the issue of legislative intent, though it may be persuasive in certain circumstances. Where there is a question, established principles of statutory construction must be utilized.
State v. Bussey, 463 So.2d 1141, 1143 (Fla. 1985) (citation omitted).
Turning to well-settled principles of statutory construction, this Court has held that "[t]he legislative use of different terms in different portions of the same statute is strong evidence that different meanings were intended." See Mark Marks, P.A., 698 So.2d at 541; see also Beach v. Great Western Bank, 692 So.2d 146, 152 (Fla.1997) (quoting Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 914 (Fla.1995) ("[W]hen the legislature has used a term ... in one section of the statute but omits it in another section of the same statute, we will not imply it where it has been excluded.")). In the present case, while intent to defraud is not mentioned in subsection (8), it is specifically included as an element in subsections (1), (2), (3), (4), and (7) of section 817.234. Thus, this principle of statutory construction lends further support to our determination that the Legislature intentionally excluded fraud as an element of subsection (8). It is evident that the Legislature knew how to include intent to defraud as an element, and it could have easily done so with respect to subsection (8) if it so wished.
Respondent Bradford further urges us to consider another principle of statutory construction which dictates that statutes dealing with the same subject matter should be considered in pari materia in an effort to give effect to legislative intent. See, e.g., McGhee v. Volusia County, 679 So.2d 729, 730 n. 1 (Fla.1996) ("The doctrine of in pari materia requires the courts to construe related statutes together so that they illuminate each other...."); Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992) ("[A]ll parts of a statute must be read together in order to achieve a consistent whole."). In this respect, the district court below reasoned that "[w]hen reading subsection (8) [which does not include fraud as an element] in pari materia with subsection (1)(a) [which does include fraud as an element], it becomes obvious that the Legislature in enacting subsection (8) intended to punish only solicitations made for the sole purpose of defrauding that patient's PIP insurer." Bradford, 740 So.2d at 571. We conclude that the district court's reasoning that the concept of reading statutes in pari materia necessarily incorporates the fraud requirement contained in subsection (1) into subsection (8) is premised on a misguided interpretation of that particular canon of statutory construction. Simply, the concept of reading statutes in pari materia does not require that elements from one subsection be carried over and inserted into another subsection even if the statutes are related. See Hansbrough, 757 So.2d at 1283-84 ("The fact that subsection (1)(a) of the statute prohibits certain acts in connection with insurance claims if committed with intent to defraud, as observed in Bradford, does not automatically lead to the conclusion that all portions of the same statute require proof *820 of specific intent to defraud.") (Stone, J., concurring specially).
Thus, we conclude that the plain meaning of the statute does not indicate that fraud is an element; the legislative history does indicate that there was ample opportunity to include intent to defraud in subsection (8), yet the Legislature did not do so; and lastly, but of no less importance, principles of statutory construction lead to the conclusion that the Legislature was well aware of how to incorporate the element of fraud into these subsections (as evidenced by subsections (1), (2), (3), (4) and (7)), yet it declined to do so as related to subsection (8). As a result, we conclude that the Legislature has not included fraudulent intent as an element of the offense of unlawful insurance solicitation.

2. Whether Section 817.234(8), Florida Statutes (1997), Constitutes an Impermissible Restriction on Commercial Speech in Violation of the First Amendment.
Statutes or regulations which restrict commercial speech are analyzed under the framework established by the United States Supreme Court in Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[8]See also Florida Bar v. Went For It, Inc., U.S. 761 (1993); Shapero v. Kentucky Bar Ass'n, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); see generally P. Cameron DeVore, Advertising and Commercial Speech, (PLI Patents, Copyrights, Trademarks & Literary Property Course, Series 582, 1999). Under the Central Hudson test, the State may regulate commercial speech relating to unlawful activities, and commercial speech that is misleading. See 447 U.S. at 563-64, 100 S.Ct. 2343. Commercial speech which does not fall into either of those categories, however, may still be regulated if the State meets its burden of establishing the following three related requirements. See id. at 564-66, 100 S.Ct. 2343. First, the State must establish a substantial interest in support of the restriction on commercial speech. See id. Second, the State must also show that the restriction directly and materially advances that substantial interest. See id. Finally, the State must demonstrate that the regulation is narrowly tailored. See id.
At the outset, we must answer the threshold question of whether the commercial speech being regulated by this case concerns unlawful activity or is misleading. In this case, it is clear to us, and the State readily concedes, that the commercial speech regulated in this case does not relate to an unlawful activity and is not misleading. Thus, we must proceed to determine whether the State has carried its burden of satisfying the three-prong test set forth by Central Hudson.

A. Substantial State Interest
"Unlike rational basis review, the Central Hudson standard does not permit us to supplant the precise interests put forward by the State with other suppositions." Went for It, 515 U.S. at 624, 115 S.Ct. 2371 (quoting Edenfield, 507 U.S. at *821 768, 113 S.Ct. 1792). In the instant case, the State asserts the following interests in support of section 817.234(8):
(1) The State has a substantial interest in protecting the public from unnecessarily inflated insurance rates for personal injury protection and liability insurance.
(2) The State has a substantial interest in preventing fraud and misrepresentation by professionals.
(3) The State has a substantial interest in protecting the privacy of its citizens involved in motor vehicle accidents.
(4) The State has a substantial interest in promoting the ethical standards of professionals, consistent with the laws of Florida, who make claims for personal injury protection benefits and motor vehicle tort claims related to the motor vehicle accidents of its citizens.
Petitioner's Initial Brief on the Merits at 26.
It would be difficult for us to conclude that the above interests are not indeed substantial. The United States Supreme Court, in Edenfield, specifically concluded that States have a substantial interest in the prevention of fraud and misrepresentation. See 507 U.S. at 768-69, 113 S.Ct. 1792 (citing Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). The Court likewise concluded that States have a substantial interest in protecting the privacy of their citizens, and has specifically approved that interest as it relates to personal injury victims involved in automobile accidents. See Went For It, 515 U.S. at 625, 115 S.Ct. 2371. Finally, the Court has also concluded that States have a substantial interest in promoting the ethical conduct of professionals who practice within their boundaries. See id. (quoting Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)); see also Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Accordingly, we determine that the State has satisfied its burden of setting forth substantial interests in support of this restriction on commercial speech.

B. Direct and Material Advancement of Substantial Interests
The Central Hudson test requires us to next determine whether the statute at issue advances any one of the State's asserted interests in a "direct and material way." Went for It, 515 U.S. at 625, 115 S.Ct. 2371 (quoting Rubin v. Coors Brewing Co., 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995)). The United States Supreme Court has explained that the State's burden as to this prong
is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.
Went For It, 515 U.S. at 626, 115 S.Ct. 2371 (quoting Rubin, 514 U.S. at 487, 115 S.Ct. 1585); see also Zauderer 471 U.S. at 648-49, 105 S.Ct. 2265. The same Court has further explained:
[W]e do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus and "simple common sense."
*822 Went for It, 515 U.S. at 628, 115 S.Ct. 2371 (citations omitted).
In Edenfield, for instance, the United States Supreme Court invalidated Florida's ban on in-person solicitation by certified public accountants ("CPAs"), reasoning that the Board of Accountancy had "present[ed] no studies that suggest personal solicitation of prospective business clients by CPA's creates the dangers of fraud [and] overreaching." 507 U.S. at 771, 113 S.Ct. 1792. While the record contained a somewhat skeletal and conclusory affidavit authored by a former chairman of the board, the Court noted that "[t]he record [did] not disclose any anecdotal evidence, either from Florida or another State, that validate[d] the Board's suppositions." Id. Thus, the Court determined that nothing in the record substantiated the State's allegation of harm.
The evidence presented by the Board of Accountancy in Edenfield stands in stark contrast to that which The Florida Bar presented in Went For It, in support of its prohibition on targeted mail soliciting personal injury or wrongful death clients within thirty days of the accident. The Florida Bar, in that case, presented a 106-page summary of its two-year study of lawyer advertising and solicitation, which contained statistical and anecdotal data supporting the Bar's contention that Florida citizens viewed direct-mail solicitation immediately following accidents as an intrusion on victims' privacy that reflected poorly on the legal profession. See Went For It, 515 U.S. at 626, 115 S.Ct. 2371. Noting that the "anecdotal record mustered by the Bar is noteworthy for its breadth and detail," id. at 627, 115 S.Ct. 2371, the Court found that the Bar's restriction targeted a concrete, nonspeculative harm. See id. at 629, 115 S.Ct. 2371.
As to this second prong of the Central Hudson test, the State correctly contends that it is not required to establish that each of its asserted interests is or will be directly advanced by section 817.234(8). Rather, the State need only establish that its restriction on commercial speech directly and materially advances one of its substantial interests. See Went For It, 515 U.S. at 625 n. 1, 115 S.Ct. 2371. The interest which the State focused on throughout its briefs to this Court and its presentation during oral argument was the prevention of insurance fraud. As such, it relied on the 1975 Report forming part of section 817.234's legislative history.[9]
This 1975 Report, entitled "Investigation Into False Claims of Lawyers and Doctors," began as follows:
The Grand Jury has heard testimony concerning the practice of a small group of lawyers, physicians, osteopaths, chiropractors and hospitals who work together to inflate or outright falsify personal injury claims.
1975 Report at 5. The 1975 Report chronicled a typical fraudulent insurance scheme involving attorneys, doctors, hospitals and runners. As the State asserts, the Report
documented fraud in piercing Florida's no-fault threshold. The fraud, or "harm feared," was that persons with "little or no injuries" were solicited for medical treatments that became the basis for making claims of personal injury protection benefits, and when the medicals exceeded that threshold, motor vehicle tort claims. The effect was an increase in both the number of recoveries and dollar value of recoveries for pain and suffering in personal injury actions. These claims were paid by defendant insurance companies and passed on as a cost of doing business to Florida citizens *823 through unnecessary insurance rate increases.
Petitioner's Initial Brief at 28.
The district court below relied on its earlier decision in Barr which noted:
As the report suggests, there was a serious problem in the industry of "runners" soliciting automobile accident victims with little or no injuries to undergo unnecessary medical treatment so that they could exhaust the victims' PIP benefits before the victim sued in tort for damages. From an objective standpoint, we believe the statute's prohibition against this type of solicitation provides a direct link to the state's interest in preventing harm to such victims and the insurance industry.
Barr, 731 So.2d at 129. The State has attempted to rely on a more recent grand jury report which likewise focuses on the fraudulent framework detailed above. See Second Interim Report of the Fifteenth Statewide Grand Jury: Report on Insurance Fraud in Florida in the Area of Personal Injury Protection (on file with Clerk, Fla.Sup.Ct.) (hereinafter "2000 Report"). The 2000 Report makes similar observations to those made by the 1975 Report; its import, however, is in the documentation that these unscrupulous practices continue to take place.
While these reports certainly indicate that the evil which the State seeks to correct is unacceptable to all professions, real, and pervasive, section 817.234(8) does not directly and materially advance the State's goal of preventing insurance fraud. The statute criminalizes solicitation "for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits." The State maintains that "[c]ommon sense dictates that criminalizing a particular action deters that action." The State is correct. The Legislature obviously hopes that the criminalization of an activity will lead to its deterrence. However, United States Supreme Court precedent requires that the restriction on commercial speech directly and materially alleviate the evil (i.e., insurance fraud), see Went For It, 515 U.S. at 626, 115 S.Ct. 2371 (quoting Edenfield, 507 U.S. at 770-71, 113 S.Ct. 1792); that this subsection does not accomplish.
Section 817.234(8) does not directly and materially prohibit solicitation which results in fraudulent tort and PIP benefits claims. Rather, it prohibits all solicitation "for the purpose of making motor vehicle tort claims or claims for personal injury protection benefits," irrespective of whether insurance fraud is involved. Thus, we conclude that the statute does not directly and materially alleviate the problem of insurance fraud and actually condemns totally lawful conduct.

C. Narrowly Tailored
Even if we were to conclude that the statute does directly and materially alleviate the problem, section 817.234(8) would still violate First Amendment parameters because it is not narrowly tailored to achieve the State's articulated interest prevention of insurance fraud. In reaching this determination, we considered, as United States Supreme Court precedent requires, the relationship between the State's interests and the means by which it seeks to accomplish them. Our analysis is guided by the following pronouncement by the United States Supreme Court:
What our decisions require ... is a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interests served, that employs not necessarily *824 the least restrictive means but ... a means narrowly tailored to achieve the desired objective. Of course, we do not equate this test with the less rigorous obstacles of rational basis review; in Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417, n. 3, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), for example, we observed that the existence of numerous and obvious less-burdensome alternatives to the restriction on commercial speech ... is certainly a relevant consideration in determining whether the fit between the ends and means is reasonable.
Went For It, 515 U.S. at 632, 115 S.Ct. 2371 (quotation marks omitted)(emphasis supplied); see also Bd. of Trustees v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Shapero, 486 U.S. at 476, 108 S.Ct. 1916.
In this case, the State, relying on language from Barr, seeks to meet its burden by maintaining that section 817.234(8):
[I]s not a blanket ban on all solicitation of business by a chiropractor, but rather, targets only those persons who solicit business for the sole purpose of making motor vehicle tort or PIP benefits claims. Although not the least restrictive means available to achieve the state's purpose, we hold the ban on solicitation is reasonably tailored to the state's interest of preventing insurance fraud and raised premiums.
731 So.2d at 129. More specifically, the State argues that:
A chiropractor could hire hundreds of telemarketers to solicit new patients full time and not be in violation of Florida's criminal statute, so long as the chiropractors are not soliciting persons for the purpose of filing a motor vehicle tort claim or claim for personal injury protection benefitsthe limited restriction imposed by the statute.
Petitioner's Initial Brief at 29. While the statute, as drafted, may prevent or deter fraud, its criminal net also captures legitimate and otherwise lawful conduct, the State's semantics notwithstanding. As the First District's opinion in Cronin points out, "[e]very solicitation of business from an accident victim ... has the potential of being funded by the proceeds of a tort settlement or PIP claim." 774 So.2d at 876. There is, however, absolutely nothing sinister about presenting honest and legitimate requests for compensation from a PIP carrier or filing a tort claim based on damages sustained in an automobile accident. Absent the element of fraud, which we have already concluded is not part of this statute, this subsection criminalizes conduct which is entirely lawful and within the protections voiced by the United States Supreme Court. This was aptly recognized by the First District in Cronin:
The statute as written is far too broad in terms of the scope of activities it can potentially reach. Proof of any advertisement for chiropractic services which solicits business from automobile accident victims would arguably be sufficient to get a prosecutor past a motion for judgment of acquittal in a prosecution based on an alleged violation of the statute, the theory being that the advertiser or solicitor obviously intended to be paid for his or her services with the reference to the accident being considered as evidence of an intent to access recoverable tort claims, damages, or PIP benefits. The fact that a prospective client may have had a legitimate need for chiropractic services as a result of an automobile accident would be irrelevant given that the statute contains no requirement that there be an intent to defraud.
Id. at 875. We agree with this reasoning and conclude that without fraud as an element, *825 the statute provides "only ineffective and remote support for the government's purpose." Central Hudson, 447 U.S. at 564, 100 S.Ct. 2343.
Although not specifically within the context of solicitation by chiropractors, the United States Supreme Court, in a long list of decisions dating back to the late 1970s, has recognized the import of advertising professional services and has, with few exceptions, invalidated regulations which unduly burden that form of commercial speech. One of these first cases was Bates v. State Bar of Arizona, 433 U.S. 350, 383, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), wherein the Court held that "advertising by attorneys may not be subject to blanket suppression." Although the specific facts in Bates concerned a newspaper advertisement relaying the availability and terms of routine legal services, the Court has proceeded to expand and address other forms of solicitation in later cases.
For instance, in In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982)a case involving restrictions on the terms used to describe an attorney's practice; limits on mailing lists for attorneys' announcements; and restrictions on advertising the jurisdictions in which an attorney is licensed to practicethe Court went as far as to hold:
States may not place an absolute prohibition on certain types of potentially misleading information ... if the information also may be presented in a way that is not deceptive.... Although the potential for deception and confusion is particularly strong in the context of advertising professional services, restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception.

(Emphasis supplied.)
Three years after the decision in In re R.M.J. was rendered, the Court considered Zauderer, 471 U.S. at 626, 105 S.Ct. 2265. In that case, the Court reversed in part an Ohio decision disciplining an attorney for recommending his services in a newspaper advertisement that included legal advice. See id. at 656, 105 S.Ct. 2265. Specifically, the attorney had advertised his willingness to represent women who had suffered injury from the use of the Dalkon Shield intrauterine contraceptive device. See id. at 629-30, 105 S.Ct. 2265. The Zauderer Court commented that a restriction which sought to prevent litigation by prohibiting information to the public relating to potentially legitimate claims would be unconstitutional. See 471 U.S. at 642-44, 105 S.Ct. 2265.
Later, in Shapero, 486 U.S. at 466, 108 S.Ct. 1916, the Court invalidated a regulation that prohibited lawyers from soliciting legal business for pecuniary gain by sending truthful and nondeceptive letters to potential clients who the lawyer knew faced a particular legal problem. In that case, the Kentucky Supreme Court disapproved of Shapero's letter simply because it was directed to those who the attorney knew would need his services, even though a mailing to the public at large would necessarily include persons known to need Shapero's services. See id. at 473, 108 S.Ct. 1916. The Court concluded:
[T]he First Amendment does not permit a ban on certain speech merely because it is more efficient; the State may not constitutionally ban a particular letter on the theory that to mail it only to those whom it would most interest is somehow inherently objectionable.
Id. at 473-74, 108 S.Ct. 1916. The Court reasoned that the mere opportunity "for isolated abuses or mistakes does not justify a total ban on that mode of protected commercial speech." Id. at 476, 108 S.Ct. 1916.
*826 One of the most recent pronouncements by the United States Supreme Court on professional solicitation of business is found in its decision in Edenfield, which addressed Florida's ban on in-person solicitation by CPAs. The regulation was invalidated primarily because the State could not satisfy Central Hudson's penultimate prong (i.e., the regulation must directly and materially advance a substantial interest). See Edenfield, 507 U.S. at 773, 113 S.Ct. 1792. However, the Edenfield Court added that in-person solicitation, which also included telephonic solicitation, by nonlawyers could not be subject to a prophylactic ban. See id. at 774-76, 113 S.Ct. 1792. The Court's conclusion was based on its reasoning that CPAs, unlike lawyers, are not trained in the art of persuasion. See id. In the present case, the statute at issue prohibits "any person," regardless of their persuasive abilities, to solicit for purposes of filing a tort claim or PIP benefits. Thus, it is much too broad to comply with Central Hudson's requirements and with the restrictions established by United States Supreme Court precedent.
The Supreme Court's cases on professional advertising are unmistakably clear that such form of commercial speech is heavily protected. In fact, of the Court's leading cases which have addressed restrictions on advertising of professional services, the Court has only upheld those restrictions on two occasions. First, in Ohralik v. Ohio State Bar Association, 436 U.S. 447, 449, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), the Court upheld a prophylactic rule banning all face-to-face solicitations by lawyers. In that case, the Court explained that "the potential for overreaching is significantly greater when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person." Id. at 465, 98 S.Ct. 1912. In Edenfield, as previously noted, the Court clarified that:

Ohralik does not stand for the proposition that blanket bans on personal solicitation by all types of professionals are unconstitutional in all circumstances. Because "the distinctions, historical and functional, between profession, may require consideration of quite different factors," the constitutionality of a ban on personal solicitation will depend upon the identity of the parties and the precise circumstances of the solicitation. Later cases have made this clear, explaining that Ohralik's holding was narrow and depended upon certain "unique features of in-person solicitation by lawyers."
507 U.S. at 774, 113 S.Ct. 1792 (citation omitted)(quoting Virginia State Bd. of Pharmacy, 425 U.S. at 773 n. 25, 96 S.Ct. 1817). Thus, the Edenfield Court concluded that Ohralik made it clear that "a preventative rule was justified only in situations `inherently conducive to overreaching and other forms of misconduct.'" Id. (quoting Ohralik, 436 U.S. at 464, 98 S.Ct. 1912).
Additionally, Ohralik only banned face-to-face solicitation, whereas section 817.234(8) does not make that distinction. Instead, this statute bans all forms of solicitation. The First Amendment has not been interpreted to permit such a prophylactic restriction on commercial speech as has been attempted in the subject statute. See NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."); see also In re R.M.J., 455 U.S. at 203, 102 S.Ct. 929 (holding that advertising may be banned outright only if it is actually or inherently misleading).
*827 The other leading case in which the Court upheld a restriction on solicitation of professional services was Went For It, 515 U.S. at 618, 115 S.Ct. 2371. In that case, the Court determined that The Florida Bar's prohibition on targeted mail soliciting personal injury and wrongful death victims within thirty days of the accident passed constitutional muster since the restriction was "narrow both in scope and in duration." Id. at 635, 115 S.Ct. 2371. The restriction in this case, however, is far from being narrow in scope or duration. It prohibits solicitationwhether face-to-face, telephonic or writtenat all times, so long as the solicitation is done with the intent to file a PIP or tort claim. Although the State posits that this is a narrow restriction, common sense indicates otherwise. Under Florida law, virtually every owner or registrant of a motor vehicle must maintain PIP insurance.[10] It is a safe assumption that all Florida citizens, chiropractors included, are aware of this requirement. It is also a safe assumption that chiropractorsjust as others who engage in a profession or tradewho solicit patients or customers do so with the thought of being compensated for their services. In all likelihood, this compensation, or at least a part thereof, will come from PIP insurance benefit proceeds in those cases where chiropractic services are rendered due to involvement in an automobile accident. Thus, almost every act of solicitation directed toward someone involved in a motor vehicle accident would lead to prosecution under this section simply because payment under such circumstances would usually flow from PIP benefits. When we consider that pursuant to this statute "any person" who contacts another, by any means, may be charged with violating 817.234(8) if they do so intending to recover payment, to which they are legitimately and lawfully entitled, from a PIP carrier or through a tort claim, it is apparent that this statute is not narrowly tailored and casts a net far beyond constitutional boundaries.
Although United States Supreme Court precedent affords abundant support for our conclusion here that this statute violates the First Amendment, other courts having had an opportunity to address similar statutes specifically directed toward the conduct of chiropractors have also reached the same conclusion we reach today. For instance, in Bailey v. Morales, 190 F.3d 320, 325 (5th Cir.1999), the Fifth Circuit Court of Appeals invalidated a Texas statute which prohibited chiropractors and professionals from soliciting potential clients if the solicitation was in person or by telephone and if the individuals solicited were known to the chiropractors to have a special need for chiropractic services, such as having been in an accident or having a preexisting condition. Similarly, in Silverman v. Walkup, 21 F.Supp.2d 775, 780 (E.D.Tenn.1998), a Tennessee federal court held that a statute which proscribed both face-to-face and telephonic solicitation by chiropractors and prohibited chiropractors from "accident" telemarketing violated the chiropractors' First Amendment rights, pursuant to the Central Hudson test. That court reasoned that a blanket ban on face-to-face as well as telephone solicitation of accident victims is not narrowly tailored. See id.
Moreover, given the nature of the inquiry in relation to this prong of the constitutional test, we must consider whether there are less restrictive measures which the State may employ in an effort to curtail insurance fraud. See, e.g., Went For It, 515 U.S. at 632, 115 S.Ct. 2371; Shapero, 486 U.S. at 476, 108 S.Ct. 1916. One *828 very obvious less restrictive manner with which to prevent insurance fraud would be to include "intent to defraud" as an element of 817.234(8). The Legislature could have easily done so, yet it decided to not include such element in defining the prohibited conduct. Although it may be tempting to extricate this statute from the "constitutional dustbin" by reading into it an element of fraud, as was attempted below, such a reading cannot be sustained under applicable Florida law and such was not intended by the Legislature.
It is also important to note that another factor which must be taken into consideration is that this is a criminal statute and not simply a rule of professional conduct. That is, the statute does not merely regulate with the impending threat of suspension or revocation of a professional license. Instead, this statutory provision regulates with the potential threat of criminal sanction (i.e., third-degree felony). This is another consideration which supports the conclusion that there are less restrictive measures which may be employed by the State in preventing insurance fraud.

CONCLUSION
We are compelled to note that our decision today is in no way to be interpreted as promoting, or even condoning, the practice of chasing patients, customers, or clients by a small group of those engaged in the business of rendering either medical or therapeutic care or legal advice to those who have been involved in an accident. This practice has the potential of intruding upon those whose lives have already been disrupted by involvement in an accident. Even more so, unscrupulous practices demean any professionwhether it be chiropractic, medical, or legaland perpetuate unfortunate stereotypes which adversely impact those individuals who conscientiously seek to render their professional judgment and services to those who are in need. Nonetheless, based on our above analysis and the decisions from the United States Supreme Court, we simply cannot escape the inevitable conclusion that this statute constitutes an impermissible encroachment upon First Amendment commercial speech rights. Accordingly, the district court's decision is quashed and the case is remanded with directions that Bradford's conviction be reversed.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
NOTES
[1] Because we hold the statute unconstitutional on First Amendment grounds, we decline to address Bradford's argument that the statute is also void for vagueness.
[2] The statewide effort was known as "Operation Chiro Sweep."
[3] By the time Hansbrough was released, we had already accepted jurisdiction in Bradford. Noting that we had accepted review, the Fourth District certified the questions at issue in this case as being of great public importance. The specific questions certified were:

WHETHER SECTION 817.234(8), FLORIDA STATUTES, INCLUDES A REQUIREMENT OF SPECIFIC INTENT TO DEFRAUD THE INSURER. and, if not WHETHER THE STATUTE ADVANCES THE GOVERNMENTAL INTEREST IN PREVENTING INSURANCE FRAUD AND IS NOT MORE EXTENSIVE THAN IS NECESSARY TO SERVE THAT INTEREST.
Hansbrough, 757 So.2d at 1283. Hansbrough filed a motion to consolidate his case with Bradford. That motion was denied because the briefing schedule in Hansbrough would not have allowed all parties to submit their merits briefs in a timely manner for oral argument.
[4] When initially enacted, Florida's no-fault insurance framework contained a $1000 threshold which had to be exceeded prior to the filing of a tort claim to recover intangible damages sustained in an automobile accident. See ch. 71-252, § 8, Laws of Fla. In 1976, the Legislature eliminated this monetary requirement, and in its place adopted a scheme which made recovery in tort dependent on the character of the injury suffered by the accident victim. See ch. 76-266, § 5, Laws of Fla.; see also § 627.737(2), Fla.Stat. (1997).
[5] Attached to the legislative history of this chapter law is the Final Report of the Grand Jury filed in the Circuit Court of the Eleventh Judicial Circuit, Dade County, on August 11, 1975, entitled "Investigation Into False Claims of Lawyers and Doctors" (available at Fla. Dep't of State, Div. of Archives, ser. 18, carton 70, Tallahassee, Fla.) ( hereinafter "1975 Report"). This report addresses "the practice of a small group of lawyers, physicians, osteopaths, chiropractors and hospitals who work together to inflate or outright falsify personal injury claims." 1975 Report at 5.
[6] Subsection (9) uses essentially the same language as subsection (8), except that it specifically applies to attorneys.
[7] No mention of the 1975 Report is made within the legislative history of these two subsections.
[8] Although amicus curiae Randolph Hansbrough suggests that the United States Supreme Court has indicated a willingness to abandon the Central Hudson framework in favor of a more stringent test, this Court has noted that "in its 1999 term the United States Supreme Court reaffirmed its strong adherence to Central Hudson." Amendments to Rules Regulating The Florida BarAdvertising Rules, 762 So.2d 392 (Fla.1999) (citing Greater New Orleans Broad. Ass'n, Inc. v. United States, 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999)).
[9] See supra note 5.
[10] See § 627.733, Fla.Stat. (2000).